**BEES, Contestor, v. GILRONON et, Contestees.**

Common Pleas Court, Mahoning County.

No. 139712. Decided January 22, 1953.

Herschel Kriger, Canton, Solomon Malkoff, Youngstown, for contestor.

Osborne & Osborne, William A. Mason, Youngstown, Patrick J. Mellilo, for contestees.

## OPINION

By JENKINS, J.

At the general election held November 4, 1952, the contestor and contestees were the four candidates for the office of commissioner of Mahoning County, Ohio, two to be elected. After a recount, the Board of Elections announced that 124,532 electors had voted for commissioner candidates, 59,275 on voting machines and 65,257 on paper ballots. The Board further announced that the candidates had received votes as follows: Gilronan 51,885, Wagner 47,791, Anderson 47,414 and Bees 44,427. Of these, those cast on paper ballots totalled: Gilronan 26,012, Wagner 28,006, Anderson 22,155 and Bees 27,086. Candidates Gilronan and Wagner were declared elected.

Candidate Bees brings this contest of election under §4785-166 GC and following, alleging that the votes cast for this office in the 187 precincts where 370 voting machines were used were void, and that he be declared elected to the office of County Commissioner on the result of the paper ballots, alleged to be the only legal votes cast for the office, or, in the alternative, that the court find that no person was duly elected to this office and that the election as to such office be set aside.

This serious charge is based on the claim that the names of the candidates for commissioner were not placed in the voting machines in compliance with the provisions of the constitution or of the statute.

**Article V, Section 2a, of the Ohio Constitution,** adopted by the people of Ohio in 1949, reads in part:

"The names of all candidates for an office at any general election shall be arranged in a group under the title of that office, and shall be so alternated that each name shall appear (in so far as may be reasonably possible) substantially an equal number of times at the beginning, at the end, and in each intermediate place, if any, in the group in which such name belongs."

**Sec. 4785-161e GC,** contains the following language, originally placed therein in 1939 (118 O. L. 238), and re-enacted without change in 1949 (123 O. L. 478) and in June, 1951 (124 O. L. 703):

"The names of candidates required by law to be rotated alphabetically shall be rotated by precincts in regular serial sequence, so that each name of a list or group of candidates for an office shall appear upon the several voting machines used at the election, an equal number of times, as nearly as

practicable, at the top, at the bottom and in each intermediate place, if any, under the title of the office sought."

The claims of the contestor with the evidence bearing thereon at the trial will be stated in order. First, it is submitted that the arrangement of the ballot form made the voting machines not legal instrumentalities. The names of the four candidates for commissioner were placed two by two in two columns to the right of the title of the office and not, as is the language of the constitutional provision, "under" the title. It is pointed out that only if arranged in one column "under" the title, could the provisions of the constitution and of the statute that the name of each candidate should appear at the top or beginning, at the bottom or end, and in each intermediate place substantially an equal number of times be carried out.

It is next contended that, inasmuch as the machines as set up and used failed to provide proper rotation of names, they were not legal instrumentalities. The evidence shows the ballot form, with its two columns as provided and used, in no instance placed the name of the contestor, a Democrat, in the column in which appeared the name of Stevenson, a Democratic candidate for president, who carried the county. It also shows that contestor's name, of the four in the group, appeared in the top left position on 17.8 per cent of the ballot forms, in the two lower positions on 82.2 per cent, and not at all in the top right position. The evidence is that the clerk of the board of elections attempted to get up a ballot form for the machines which would group the four names in one column under the title of the office, that this proved impractical when the needs of all the offices to go on the ballot form were considered, and that the form finally adopted was approved by the secretary of state. The printer was then instructed to print the ballot forms in rotation according to law. The forms were then printed in six series with results as to the contestor's position thereon as before stated. There was no direct supervision by the board or its employes of the printing to secure an alternation of each name substantially an equal number of times in each position. This was a grave omission. Blame for the result should not go to the printer, as the difficulties of typography were sufficient without the addition thereto of technical legal requirements of specific alternation which required the attention of an official charged with the duty. As printed and supplied for use in the voting machines, the names of the candidates on the printed ballot forms were not rotated "in regular serial sequence."

It is next pointed out that, while the statute requires rota-

·tion of ballot faces in regular serial sequence by precincts, in 56 precincts they were not identical on each machine in the precinct. This arose from the supplying of additional voting machines to the regularly supplied precincts due to an enormous increase in the number of registered voters at a late hour before the election. In view of the nature of the emergency the supplying of these nonconforming machines must be held to be a compliance with the statutory language "as nearly as practicable."

The contention that the voting machines by reason of the arrangement of the ballot form thereon were not legal instrumentalities, in that they did not and could not conform to the specific requirements of the constitution is a serious one and requires a consideration of the intention of the people in framing and adopting the amendment providing for the so-called office ballot.

Our supreme court in **156 Oh St 147** has declared that, as related to paper ballots, the provisions of the constitutional amendment set out with such clarity how the names of candidates shall be rotated, that the form of the ballot is clearly prescribed and is self-executing, making unnecessary any enabling legislation. This court, however, is without guide of authority or precedent as to the impact of this provision on ballots in voting machines.

The real intention of the people in adopting this amendment, particularly with respect to voting machines, must be ascertained, if humanly possible, and given effect. To do this the judiciary must place themselves, as far as possible, in the position the framers, the people of Ohio, occupied when they formulated it.

Voting machines as means for the expression of a voter's ▮ will have been provided for by law in this state since 1898, and as has been hereinbefore stated the language of §4785-161e GC, relating to rotation of names in connection with voting machines, has remained in its identical language since 1939. It is clear that the voters of Ohio in adopting the amendment in 1949 had in mind the use of these agencies in carrying out their will expressed therein. All courts have held that a constitutional provision shall receive a liberal interpretation with respect to those provisions which were designed to safeguard and effectuate the rights of the citizen. There is no higher right of a citizen than that, as sovereign, of voting for and electing the officers of government and of having his vote recorded and made effective.

Thomas Jefferson, one of the founding fathers, gave this advice to our young country: "Laws and institutions go hand

134

in hand with the progress of the human mind." In the spirit of this democratic doctrine our supreme court has held (102 Oh St 505): "As civilization develops, and as new inventions and devices take their place in society, wherever the public is concerned and the welfare of the people is in issue, technical constitutional invasions must give way." That meaning, then, is to be ascribed to the constitution which will not thwart or defeat, but which will accomplish and further the people's purpose in its enactment or adoption. The people of Ohio intended the office ballot amendment and its provisions "in so far as may be reasonably possible" to apply to the use of voting machines.

With respect to the specific provision "that all candidates for an office shall be arranged in a group 'under' the title of that office," it is enough to say, as did the Supreme Court of the United States in 8 How. 356, that the term "under" is sometimes used in its literal sense of "below in position," but more frequently in its secondary meaning of "inferior" or "subordinate." This court holds that, giving effect to the intention of the people, the latter is the meaning as used here.

Coming to the failure, in printing the ballot forms for the machines, to secure an alternation in regular sequence so that each candidate's name would appear a substantially equal number of times in each position, this, due to lack of official supervision of the work of the printer, was a grave irregularity. People being what they are, there is "something in a name," and the people, believing that a psychological advantage accrues to a name by its position on a ballot, provided that this believed advantage should be shared among the candidates and stated how "in so far as reasonably possible" it should be done. Candidate Bees equally with each of the others was entitled to whatever advantage substantially equal rotation of position would give.

There is no evidence of fraud in this case; no evidence of any purposeful design on the part of anyone to manipulate the alternation of ballot forms; just plain oversight or failure in providing direction in the sequential printing of the forms. An irregularity in the performance of their duties by election officials, if a matter of substance, if it fails to give to all electors alike an opportunity to express themselves freely in their choice, would vitiate an election. Where the honesty of the ballots cast is not in question, where all the voters have an opportunity to give a free and fair expression of their will, and where the actual result thereof is clearly ascertained, a procedural neglect by election officials will not justify the rejection of such votes. Here the votes of 59,275 legal electors are affected and their disfranchisement is in issue.

A procedural irregularity being evident, and every vote on the instrumentalities provided being honestly cast, the question then is: were all the voters alike by the use of these ballot forms able to give a free expression of choice? It is clear that whatever the arrangement of the names of the four commissioner candidates with respect to each other was on the ballot form provided, whether paper or machine, the individual voter had to look for the individual names of the two candidates of his choice and vote for each of them individually. If he wanted to vote for a candidate of his party regardless of name he would have to look more closely, because the constitution requires the party name to be printed under the candidate's name "in lighter and smaller type face." That this was the deliberate purpose and clearly expressed intent of the people when they adopted the office ballot system is shown in the language used in Article V, Sec. 2a, which has not hereinbefore been quoted:

"An elector may vote for candidates only and in no other way than by indicating his vote for each candidate separately from the indication of his vote for any other candidate."

The constitution intended him to search for the name of the candidate of his choice and to express his choice for that one without regard to any one else on the ballot. It assumed his ability to read and his intelligence to indicate his choice wherever the name appeared on the ballot independently of any other candidate. Every single voter in Mahoning County by paper or machine ballot had the opportunity of this free choice.

In passing, it is clear that the above cited language of the office ballot amendment disposes of the objection raised to the fortuitous circumstance of the name of the contestor appearing always in a column headed by Eisenhower.

The irregularity in failure to carry out the rotation "in so far as reasonably possible,"—because it was reasonably possible to provide supervision which would bring about the substantial equality in positions—was not then a matter of substance requiring the setting aside of the election. The action of the law in so saying must not be taken as condoning in the least the irregularity shown or as failing to warn against its repetition by all election officials from the secretary of state down.

The judgment of the court is that candidates Edward J. Gilronan and Fred A. Wagner were duly elected to the office of County Commissioner of Mahoning County at the general election held November 4th, 1952.