301 So.2d 508 (1974)
Jeanne Khoyi NELSON, As Supervisor of Elections in Pinellas County, et al., Appellants,
v.
A.S. Jim ROBINSON et al., Appellees.
No. 74-1201.
District Court of Appeal of Florida, Second District.
October 15, 1974.
*509 W. Gray Dunlap, County Atty. for Pinellas County, for appellants Supervisor, Canvass Board and County Commissioners.
John W. Hamilton, St. Petersburg, for appellant Belanger.
Carlton R. Reichert, St. Petersburg, for appellants Hieber, Hunsinger and Gibson.
William H. Fleece of Fleece, Rhoades & Werly, St. Petersburg, for appellees Robinson, Rackow, Jones and Polfer.
Thomas M. Woodruff, in pro per.
McNULTY, Chief Judge.
Appellees, plaintiffs below, brought this suit to invalidate five contested races in the first Republican primary election held in Pinellas County on September 10, 1974. They are all unsuccessful candidates in one or another of those races. Appellants are the Pinellas County election officials and the successful candidates in those races.
The principal issue in the case is whether appellees were denied equal protection of the law because of their claimed unfavorable position on the ballot. On essentially undisputed findings the trial judge voided the election as to those five races and ordered new primary elections therein. We reverse.
The problem arose because the September 10 primary contained the longest ballot in Pinellas County history. In order to include all of the races on the voting machine ballot, the election officials adopted a *510 ballot combining a horizontal and vertical configuration. The effect was that in certain races, rather than the names of all of the candidates for a particular office being on the same line of the voting machine, some of them appeared under each other on the next line. For example, where three candidates were running, the names of two of them were placed under the name of the office, and the name of the third candidate was placed on the next line immediately under the name of the first. Where five candidates were involved, the names of the first three were on the top line and the names of the last two were on the line immediately below. The ballots were printed in different pastel colors (in conformity with statutory authority,[1] incidentally) such that the name of each office as well as the names of all of the candidates running for that office were placed in the same color grouping. In each instance the names of the appellees, being later in the alphabet than the names of their opponents, appeared on the lower line.
The court held that the alignment of the candidates in these races was in substantial compliance with the election laws of the state. Nevertheless, he found that the alignment and location of the names of the appellees in their respective races was "... confusing and prejudicial as compared to the position and location of the names of the other candidates in their same respective races... ." He held, moreover, that such discrimination was not based upon any reasonable classification and thereupon concluded that such discrimination resulted in a deprivation of equal protection of the law as guaranteed appellees under the State and Federal Constitutions.
We observe at the outset that an election may be broadly defined as an expression of choice by the voters of a public body politic, or as the means by which a choice is made by the electors.[2] It carries with it the idea of a choice in which all who are to be affected by the choice participate.[3] It necessarily follows, therefore that the paramount purpose of an election is to provide the people with the means and opportunity to express a full, free and open choice in the usually opposing matters which constitute the subject of the election.[4]
It must next be postulated that the right to vote is a political right, as distinguished from a civil right or a right of person or property;[5] but it is a right which has been protected by the courts long before that right received the consideration of the legislatures.[6] Accordingly, a vital consideration guiding the courts in determining whether an election should be voided is the reluctance to reach a decision which would result in the disfranchisement of the voters. Indeed, as regards defects in ballots, the courts have generally declined to void an election unless such defects clearly operate to prevent that free, fair and open choice hereinabove spoken of.[7]
*511 So, consonant with the concept that the paramount right in and to elections rests in the people for whose ultimate benefit such elections are held in the first place, we are compelled to hold that when qualified electors responsibly and in good faith lay aside their everyday affairs to-execute the duties of their solemn office, they have the fundamental right to the confidence that their efforts will not thereafter be judicially rendered sterile absent fraud or other extraordinary circumstances which operate to deprive them of a full and efficacious vote. Unless, therefore, that as to them there was indeed a "nonelection," i.e., there was not that full, free and open opportunity to express their choice, the courts should be extremely reluctant to set aside or void such election. Put another way, the fundamental question to be answered is: Can it be said that the election was not a free expression of the public's will?
With that caveat in mind, then, we now consider the merits hereof. In concluding as he did the trial court expressly held that:
"... such facts as hereby determined by this court can reasonably be expected to have affected the outcome of the races in which plaintiffs were involved creating a reasonable possibility that the results of said election could have been changed if such prejudice had not been presented." (Italics ours.)
In our view the trial court misconstrued the law as to the test to be applied. It is not sufficient that a showing is made of a mere "reasonable possibility that the results of an election could have been changed by irregularities; rather, there must be a showing of a reasonable probability that the results of said election would have been changed except for such irregularities. That error of itself would require a reversal hereof. But further than that, in this case, we can say also that even if the trial court had applied the correct test herein the facts as he found them would, as a matter of law, be insufficient to meet it. Forty-eight assorted voters, poll workers and clerks, thirty-one of them called by plaintiffs/appellees, testified. Yet no finding was made that even a single voter was prevented from exercising this free choice although, concededly, it was found that several voters were "confused." But mere confusion does not amount to an impediment to the voters' free choice if reasonable time and study will sort it out; and no denial is made that, ultimately, all but one of the "confused" voters who testified were able with reasonable time and effort to find their choices, some of which choices included one or more of the appellees. Parenthetically, it should be noted too that ample notice was given that aid and assistance was available at each polling place to help a voter should he need it. No finding was made, nor was there any basis for one, that an unusual or inordinate number of voters sought such assistance.
Expressly, the only other evidence upon which the trial court relied was his own observation of the voting machine. He concluded from that, as noted, that the ballot was "confusing and prejudicial," which is a far cry from satisfying the proper test of invalidity we set out above. Moreover, in the presence of counsel for the parties we have examined the same machine, which forms a part of this record, and can say as a matter of law that nothing can be found therein which of itself would support the conclusion that a prudent, observant and conscientious voter was prevented from making his rightful choice.
We come now to the rights of the appellees as candidates in the premises. Apart from a candidate's equal protection rights to appear on the ballot,[8] and no denial *512 of that right is claimed here, we hold that an unfavorable position on that ballot (from the candidate's standpoint) which does not also prevent the exercise of the peoples' right to a full, free and open choice, cannot operate as a predicate for an equal protection claim by the candidate.[9] Keeping in mind that we are talking about a claim made after an election, and not one which may have been enforceable before, if a candidate appears on the ballot in such a position that he can be found by the voters upon a responsible study of the ballot, then such voters have been afforded a full, free and open opportunity to make their choice for or against that particular candidate; and the candidate himself has no constitutional right to a particular spot on the ballot which might make the voters' choice easier. His constitutional rights in the matter end when his name is placed on the ballot. Thereafter, the right is in the voters to have a fair and reasonable opportunity to find it; and as to this, it has been observed that the constitution intended that a voter search for the name of the candidate of his choice and to express his choice for that candidate without regard to others on the ballot. Furthermore, it assumes his ability to read and his intelligence to indicate his choice with the degree of care commensurate with the solemnity of the occasion.[10]
Finally, we must state that we chose to meet head-on the question of equal protection, principally because of its novelty rather than consider the matter of waiver or estoppel which appellants suggest on account of appellees waiting until after the election to complain. While we need not now reach that question, it may be observed that it has often been held that one who does not avail himself of the opportunity to object to irregularities in the ballot prior to the election may not object to them after.[11]
In concluding, though we are here disagreeing with the very able trial judge, we are constrained to make some observations concerning his judicious handling of this case. Judge Goodrich, a Hillsborough County Circuit Judge who was presiding in Pinellas County by special assignment, held hearings commencing on September 19, 1974, and continuing thereafter on September 23, September 25, September 27, September 28 and September 30, 1974, in several instances working well into the night. Recognizing the exigencies of the case, he tried the case with dispatch, yet was scrupulous in protecting the rights of all parties. He entered a twenty-seven page final judgment in which he painstakingly detailed his findings of fact and conclusions of law. His dedication is apparent and his conscientiousness epitomizes the highest traditions of the judiciary. He should be commended. Likewise, the performance of the clerk's personnel and the court reporters was exemplary, particularly with respect to the manner by which they were able to transmit to us the lengthy record in the exigent time frame within which all were working. We must presume to bespeak the gratitude of the citizenry.
In view of the foregoing opinion, the judgment appealed from should be, and it is hereby, reversed.
HOBSON and GRIMES, JJ., concur.
NOTES
[1] See, § 101.27(6), F.S. 1974.
[2] See, e.g., Pearson v. Taylor (1947), 159 Fla. 775, 32 So.2d 826, 827; Akio Kuwahara v. Acheson (D.C.Cal. 1951), 96 F. Supp. 38, 41. See also 25 Am.Jur.2d, Elections, § 1, at p. 691.
[3] See, e.g., Cipriano v. Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647, (1969); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). See also 25 Am.Jur.2d, id.
[4] Cf. Carn v. Moore (1917), 74 Fla. 77, 76 So. 337.
[5] See, e.g., Solon v. State (1908), 54 Tex. Cr.R. 261, 114 S.W. 349, 353; Blair v. Ridgely (1867), 41 Mo. 63, 97 Am.Dec. 248. See also 25 Am.Jur.2d, Elections, § 53, p. 742.
[6] See, 25 Am.Jur.2d, Elections, § 56 at p. 747.
[7] See n. 4, supra. See, e.g., In re Recall Election in the City of Hackensack, 31 N.J. 592, 158 A.2d 505 (1960); Pellegrino v. State Board of Election, 100 R.I. 171, 211 A.2d 655 (1965). See also 26 Am.Jur.2d, Elections, § 224, p. 54.
[8] See, e.g., Lubin v. Pannish (1974), 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702; Bond v. Floyd (1966), 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235; and Anderson v. Martin (1964), 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430.
[9] See, Gilhool v. Chairman & Com'rs., Philadelphia Co. Bd. of Elec., (E.D.Pa. 1969), 306 F. Supp. 1202, aff'd 397 U.S. 147, 90 S.Ct. 966, 25 L.Ed.2d 182, in which the court rejected the contention that the unfavorable location of certain candidates' names on the ballot resulted in unconstitutional discrimination against those candidates.
[10] See, Bees v. Gilronan (Ohio Com.Pl., 1953), 116 N.E.2d 317.
[11] See, e.g., 26 Am.Jur.2d, Elections, § 224, p. 55.