Joe SONNEMAN, Appellant,

v.

STATE of Alaska; The Lieutenant Governor; and the Director, Division of Elections, Appellees.

No. S–7851.

Supreme Court of Alaska.

Dec. 24, 1998.

---

Joe Sonneman, pro se, Juneau.

John B. Gaguine, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

Joe Sonneman raises several constitutional challenges to the 1995 amendment to AS 15.15.030(6), which ended the practice of rotating the order of candidates' names on election ballots, and replaced it with a random determination of the order of candidates' names. The superior court granted summary judgment in favor of the State, holding that even if candidates received some advantage based on their ballot positions, the random placement of candidates' names did not violate the challenged provisions of the United States or Alaska constitutions. We hold that the amendment does not impermissibly burden the right to vote or violate the requirement of the Alaska Constitution that elections be based on the will of the people. We therefore affirm the order of summary judgment.

### II. FACTS AND PROCEEDINGS

Alaska Statute 15.15.030(6) provides the procedure for placing candidates' names on election ballots.[1] Prior to 1995, candidates' names would be rotated as many times as there were candidates. See AS 15.15.030(6) (repealed 1995).[2] An equal number of ballots would be printed after every change. See id. This ensured that each candidate would ap-

---

1. On its face, this statute applies only to general election ballots. See AS 15.15.030(6). However, AS 15.25.060 makes it applicable to primary election ballots as well.

2. Former AS 15.15.030(6) provided:

The general election ballot shall be designed with the position of names of the candidates changed in each section as many times as there are candidates in the section in which there are the most names. As nearly as possible, an equal number of ballots shall be printed after each change. In making the changes of position, the name of the candidate at the head of each section shall be taken and placed at the bottom of the section and the column moved up so that the name that before was second is first after the change. After the ballots are printed, they shall be placed in separate stacks, one stack for each change of position. The ballots shall then be gathered by taking one from each stack, the intention being that every other ballot in the accumulated stack of ballots shall have the names of the candidates in a different position.

pear in each ballot position roughly an equal number of times. *See id.*

In 1995 the legislature amended AS 15.15.030(6).[3] Ch. 58, § 5, SLA 1995. The amendment specifies that the order of candidates' names on each ballot in each election district will be the same; however the order will be randomly determined. *See id.* Thus for single-district elections, the same candidate will be listed first on every ballot. *See id.*

The amendment was recommended by the Lieutenant Governor's Election Policy Transition Team. Its report stated that the amendment would save "between $150,000 and $250,000 per election cycle." However, the actual cost of ballot rotation in the 1994 primary and general elections was $64,024. The amendment was also intended to eliminate the confusion of voters who relied on single-order sample ballots and were confused when they found a different rotation of candidates' names on their actual ballots. The team also concluded that "[r]esearch indicates that the order of candidates' names on American ballots does not significantly influence voters."

Sonneman filed a complaint challenging the amended statute in 1996. He alleged that candidates' ballot positions will affect how many votes they receive, a phenomenon known as positional bias. He cited studies which conclude that the candidate who is listed first will receive an additional five percent of his or her total votes from voters who simply vote for the first candidate on the list. He argued that AS 15.15.030(6) is thus unconstitutional, because one candidate, based on a random drawing, will receive all the benefits of positional bias. He also argued that allocating this advantage to a single candidate violates the constitutional requirement that an election must be based on the will of the people. He filed an amended complaint adding an argument that the statute is arbitrary and unreasonable.

Sonneman supplemented his amended complaint to inform the court that he had filed as a candidate for federal office in the 1996 primary election.

Sonneman moved for a temporary restraining order and preliminary injunction to require the State to use the former version of AS 15.15.030(6) to design ballots for the 1996 primary election. The superior court denied his motion.

Both parties also moved for summary judgment.[4] The superior court granted the State's motion for summary judgment. It held that, even assuming that positional bias exists, summary judgment for the State was appropriate because AS 15.15.030(6) did not violate the challenged provisions of the United States or Alaska constitutions.

Sonneman appeals from the superior court's order of summary judgment.

### III. STANDARD OF REVIEW

■■■ This court reviews an award of summary judgment de novo. *See Mathis v. Sauser*, 942 P.2d 1117, 1120 (Alaska 1997). We will only affirm if, viewing the facts in the light most favorable to the non-moving party, "the evidence in the record fails to disclose a genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Dayhoff v. Temsco Helicopters, Inc.*, 772 P.2d 1085, 1086 (Alaska 1989)). However, the existence of a disputed factual issue will only preclude summary judgment if it is a *material* issue. *See Whaley v. State*, 438 P.2d 718, 720 (Alaska 1968). A factual issue will not be considered material if, even assuming the factual situation to be as the non-moving party contends, he or she would still not have a factual basis for a claim for relief against the moving party. *See id.* Therefore, we will affirm the order of summary judgment in this case only if, assuming that positional bias exists, the

---

3. AS 15.15.030(6) now provides:
 The general election ballot shall be designed with the position of names of the candidates set out in the same order in each section on each ballot used in an election district. However, the order of placement of the names of the candidates for each office shall be random-ly determined by the director for ballots printed for use in each election district.

4. Although he lost the primary election, Sonneman did not seek to overturn the results of the completed election.

State is nonetheless entitled to judgment as a matter of law. *See id.*

■ We review constitutional issues de novo. *See ARCO Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992). We will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

## IV. DISCUSSION

### A. Sonneman Has Citizen–Taxpayer Standing to Challenge the Constitutionality of AS 15.15.030(6)

The State argues that Sonneman lacks standing to raise his constitutional challenges. Sonneman counters that he has both interest-injury and citizen-taxpayer standing. Since we agree that Sonneman has citizen-taxpayer standing, we do not reach the question of whether he also has interest-injury standing.

■ "Standing in our state courts is not a constitutional doctrine; rather, it is a rule of judicial self-restraint based on the principle that courts should not resolve abstract questions or issue advisory opinions." *Trustees for Alaska v. State*, 736 P.2d 324, 327 (Alaska 1987) (citing *Moore v. State*, 553 P.2d 8, 23 n. 25 (Alaska 1976)). Standing is interpreted broadly in Alaska, and we favor "increased accessibility" to our courts. *Id.*

■ To establish citizen-taxpayer standing, a plaintiff must meet two requirements: (1) the case "must be one of public significance"; and (2) the plaintiff must be an "appropriate" party to bring the case. *Baxley v. State*, 958 P.2d 422, 428 (Alaska 1998) (quoting *Trustees for Alaska*, 736 P.2d at 329–30). These requirements "ensure that the plaintiff will serve as a true and strong adversary, even if the conduct in question did not directly affect the plaintiff." *Id.* A plaintiff raising constitutional issues is likely to meet the first requirement. *See id.* To meet the second requirement, the plaintiff must not be a "sham plaintiff" with no true

adversity of interest and must be capable of competently advocating the position; however, a plaintiff may still be denied standing if "there is a plaintiff more directly affected by the challenged conduct in question who has or is likely to bring suit." *Id.* (quoting *Trustees for Alaska*, 736 P.2d at 329–30).

■ Here, Sonneman is alleging several constitutional violations affecting not only his right to vote, but also the integrity and fairness of public elections. These are constitutional issues of public significance. Further, Sonneman has preserved his core constitutional arguments on appeal, and the parties are truly adverse. In addition, there is no evidence that anyone who is more directly affected is likely to challenge this statute. We thus hold that Sonneman has citizen-taxpayer standing to challenge the amendment to AS 15.15.030(6).[5]

### B. Alaska Statute 15.15.030(6) Does Not Violate the First and Fourteenth Amendments to the United States Constitution or Article I, Section 5 of the Alaska Constitution

Sonneman argues that the amendment to AS 15.15.030(6) places a heavy burden on the fundamental right to vote, which is not justified by the State's interests in saving money or preventing voter confusion. He argues that this provision impermissibly burdens the right to vote and also violates federal and state equal protection provisions.

#### 1. Appropriate constitutional analysis

■ The first issue is whether Sonneman's challenge is more appropriately analyzed under the equal protection provisions of the United States and Alaska constitutions or under the right to vote provisions of the First and Fourteenth Amendments of the United States Constitution and article I, section 5 of the Alaska Constitution. In *Anderson v. Celebrezze*, 460 U.S. 780, 786 n. 7, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the

---

5. We have affirmed citizen-taxpayer standing in several similar cases. *See, e.g., Trustees for Alaska*, 736 P.2d at 327–30 (holding that citizen had standing to maintain action challenging state land leasing system); *Carpenter v. Hammond*, 667 P.2d 1204, 1208, 1210 (Alaska 1983) (holding that citizen had standing to challenge reapportionment of a House District in which she did not reside or vote).

United States Supreme Court recognized that the impact of candidate eligibility requirements on candidates and on voters should be analyzed directly under the First and Fourteenth Amendments of the United States Constitution instead of engaging in a separate equal protection analysis. *See also Norman v. Reed*, 502 U.S. 279, 288 n. 8, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) (same); *Canaan v. Abdelnour*, 40 Cal.3d 703, 221 Cal.Rptr. 468, 710 P.2d 268, 273–74 (Cal. 1985) (analyzing challenge to a ballot write-in prohibition under the First and Fourteenth Amendments instead of under equal protection, because statute infringed directly on fundamental voting rights and did not create a suspect classification). The Court recently stated that "election code provisions governing *the voting process itself,*" or the "mechanics of the electoral process" should be analyzed to determine whether they impermissibly burden the right to vote. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344, 345, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (emphasis added).

Alaska Statute 15.15.030(6) allocates candidate positions on ballots. As such, it governs the mechanics of the electoral process itself and directly impacts voting rights under the federal and state constitutions. The statute does not, however, create any identifiable and fixed classes of candidates or voters; instead, it allocates any positional benefit randomly. Although several cases dealing with ballot positioning have utilized an equal protection analysis, these cases involved statutes that placed incumbents or one political party first, resulting in a fixed classification. *See, e.g., Gould v. Grubb*, 14 Cal.3d 661, 122 Cal.Rptr. 377, 536 P.2d 1337, 1345–46 (Cal. 1975) (holding that incumbent-first and alphabetical listing violated equal protection principles); *Culliton v. Board of Election Comm'rs*, 419 F.Supp. 126, 129 (N.D.Ill.1976) (holding that Republican-first provision vio-

lated equal protection clause), *aff'd & remanded sub nom. on other grounds by, Sangmeister v. Woodard*, 565 F.2d 460 (7th Cir.1977).

Since AS 15.15.030(6) allocates positions in a random manner, allowing each candidate an equal opportunity to obtain the benefits of positional bias, equal protection concerns are not implicated. We therefore analyze this statute as a direct burden on the right to vote instead of as an equal protection violation.[6]

### 2. *Appropriate level of scrutiny*

■ The second issue is what level of scrutiny we should apply to review this statute. Sonneman argues that we should review this statute using the strictest scrutiny, because it burdens the fundamental right to vote.

■ Although voting is unquestionably a fundamental right, not every burden on the right to vote is subject to strict scrutiny. *See O'Callaghan v. State*, 914 P.2d 1250, 1253–54 (Alaska 1996) (citing *Burdick v. Takushi*, 504 U.S. 428, 433–34, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)). States clearly have the power to enact "substantial regulation of elections" pursuant to Article I, section 4, clause 1 of the United States Constitution to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives[.]" *Id.* at 1253 (quoting *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059). The United States Supreme Court has recognized that because election laws will inevitably burden the right to vote, "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently[.]" *Id.* at 1254 (quoting *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059).

---

**6.** The regulation implementing AS 15.15.030(6), 6 AAC 25.300, does not allocate the benefit of positional bias completely randomly. The regulation provides for placement by a random drawing of the letters of the alphabet, but then allocates positions of candidates with last names beginning with the same letter alphabetically. Thus, "Miller" will always appear before "Munson," and "Smith, John" will always appear be-

fore "Smith, Walter." *See* 6 AAC 25.300(b), (d), (e). Alphabetical listing of candidates whose last names start with the same letter is not required by the statute and may conflict with its requirement of "random" determination of ballot positions. However, we do not rule on the issues which might be presented by the regulation because Sonneman challenged only the random methodology of the statute.

■ Instead of automatically applying strict scrutiny, courts apply the following standard in reviewing election code provisions that burden the right to vote:

A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Id.* (quoting *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059) (internal citations and ellipses omitted).

We must first determine, therefore, the extent to which this statute burdens the right to vote—whether it is a "severe" restriction or a "reasonable, nondiscriminatory restriction." *Id.* Although AS 15.15.030(6) does not deny candidates access to ballots, it limits access to the benefits of positional bias. In a single-district election, it will operate to give one candidate all of the votes received due to positional bias, thereby giving that candidate an advantage over all other candidates. Thus, this statute does burden the right to vote of supporters of disadvantaged candidates. *See Vogler v. Miller,* 660 P.2d 1192, 1193 (Alaska 1983) ("[R]estrictions on ballot access implicate the fundamental rights of potential candidates and voters alike.... [T]he rights thus implicated are the right to

vote and the right to associate freely in pursuit of political beliefs . . . ."); *see also Anderson v. Celebrezze,* 460 U.S. 780, 786–87, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (emphasizing that laws which affect candidates will always have a correlative effect on voters).

■ We have stated that "in ballot *access* cases, the state must show a compelling interest in order to justify infringements of these rights." *Vogler v. Miller,* 651 P.2d 1, 3 (Alaska 1982) (emphasis added). Strict scrutiny review is necessary in ballot access cases because the burden placed on the right to vote is severe when the right to vote is denied or limited to certain candidates or parties. *See id.* (reviewing ballot access restrictions using strict scrutiny); *cf. Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (reviewing one-year residency requirement for voting using strict scrutiny under equal protection analysis).

The statute in question, however, does not restrict access to the ballot or deny any voters the right to vote for candidates of their choice. *See* AS 15.15.030(6). Instead, it merely allocates the benefit of positional bias, which places a lesser burden on the right to vote. *See id.* In addition, the statute is nondiscriminatory, because it gives each candidate an equal opportunity to receive the benefit of positional bias; the benefit is not allocated in favor of any definable group such as incumbents or a specific political party. Further, the burden imposed on voters by this statute is not greater than the burden imposed in several cases which applied a lower level of scrutiny. *See, e.g., Burdick,* 504 U.S. at 434–40, 112 S.Ct. 2059 (requiring only legitimate state interest to uphold state's prohibition on write-in voting because it imposed only reasonable burdens on right to vote); *Libertarian Party of Colo. v. Buckley,* 938 F.Supp. 687, 693 (D.Colo. 1996) (requiring only legitimate interests to uphold ballot positioning statute which divided major and minor parties into two groups and determined placement within the groups by random drawing because it imposed only "minimal" burden on right to vote); *O'Callaghan,* 914 P.2d at 1263 (requiring only showing of legitimate state interests to uphold

blanket primary requirement against First Amendment challenge).

Sonneman argues that the State is required to use the fairest method of allocating the benefit of positional bias, which he asserts is rotating candidate names. Sonneman is correct in asserting that ballot rotation would be fairer, because it would place each candidate on an equal number of ballots in each position, thus equalizing the effects of positional bias. The question, therefore, is whether the legislature is required to use the fairest method, or whether a reasonable, nondiscriminatory method is sufficient.

The cases which have reviewed ballot positioning statutes conflict. Some require only that each candidate must have an equal opportunity to obtain the positional votes, holding that placement by drawing or other neutral means is constitutionally permissible. *See, e.g., Clough v. Guzzi,* 416 F.Supp. 1057, 1068 (D.Mass.1976) (holding that whether different statutory scheme is warranted to achieve "absolute fairness" is properly a legislative consideration); *Mann v. Powell,* 333 F.Supp. 1261, 1267 (N.D.Ill.1969) (holding that allocation of positional bias must be made "by lot or other nondiscriminatory means"); *Gould v. Grubb,* 14 Cal.3d 661, 122 Cal.Rptr. 377, 536 P.2d 1337, 1347 (Cal.1975) (noting that "rotational method is [not] the only constitutionally permissible ballot procedure"); *Ulland v. Growe,* 262 N.W.2d 412, 418 (Minn.1978) ("The method selected by the legislature to assist partisan voters in locating their candidates on the ballot cannot be overturned by this court merely because we think a rotation system would be marginally more fair."); *Holtzman v. Power,* 62 Misc.2d 1020, 313 N.Y.S.2d 904, 909 (N.Y.Sup.1970) (ordering that ballot positions be determined by lot), *aff'd* 34 A.D.2d 917, 311 N.Y.S.2d 824 (N.Y.App.Div.1970), *aff'd* 27 N.Y.2d 628, 313 N.Y.S.2d 760, 261 N.E.2d 666 (N.Y.1970). According to these cases, random determination of ballot positions would be constitutional.

On the other hand, some jurisdictions have held that the positional bias must be distributed as equally as possible. *See, e.g., McLain v. Meier,* 637 F.2d 1159, 1169 (8th Cir.1980) (emphasizing that positional advantage must be eliminated "as much as is possible"); *Elliott v. Secretary of State,* 295 Mich. 245, 294 N.W. 171, 173 (Mich.1940) (ordering legislature to implement rotational system).

We find that the cases which require only equal opportunity to obtain the benefits of positional bias are more persuasive. We have emphasized that it is not our function to question which of two possible solutions is the wisest as long as the legislature's choice is "both reasonable and nondiscriminatory." *O'Callaghan,* 914 P.2d at 1263.[7]

Here, the legislature specifically considered the effects of positional bias and concluded that rotational ballots were not necessary. Since the statute only imposes a minimal, reasonable, and nondiscriminatory burden on the right to vote, we decline to impose strict scrutiny review, and will uphold the statute if the State has important regulatory interests. *See id.*

### 3. *Important regulatory interests*

 The State's first interest is in reducing costs in printing the ballots. Sonneman argues that the State's interest in saving money was "a negligible and insignificant .00005 of the State's $5,000,000,000 budget during that time." The economic benefit from ending the rotation system was estimated at $64,024 per election cycle. Instead of comparing these savings with the general budget, however, the more relevant comparison lies with the ballot budget, which was $469,026.75 for the 1994 year. The cost savings from eliminating rotational ballots would thus be approximately 13.7% of the ballot budget. ·

The State also advanced an interest in preventing voter confusion. Election officials

---

**7.** Sonneman alleged that positional bias could affect 5–7% of the votes cast. He also alleged that this could change the outcome of Alaska elections, because Alaska elections are often decided by margins less than 5%. Even accepting both of these allegations as true, we find that the burden this statute places on the right to vote is reasonable. We do not, however, reach the question of whether the effects of positional bias could necessitate a stricter review if it affected a greater percentage of the votes.

affied that rotational ballots confused voters, because the actual ballots might differ from the sample ballots distributed. *Cf. Tsongas v. Secretary of Commonwealth,* 362 Mass. 708, 291 N.E.2d 149, 156 (Mass.1972) (stating in dicta that rotational ballots may "reduce[ ] the utility of the sample ballots ... and even confuse the voter"). Sonneman asserts that the State's interest in preventing voter confusion is not legitimate, because the Division of Elections could have alleviated any confusion by explaining to voters that the actual ballots might differ from the sample ballots.

We conclude that both of the State's interests are legitimate and important. Economy in government is an important objective and $64,000 is not a *de minimis* savings. Reducing voter confusion is also an important objective. Since the actual ballots will be identical to the sample ballots, the amendment may help prevent such confusion. These combined interests suffice, in our view, to justify the minimal burden on the right to vote imposed by the statute. We thus hold that AS 15.15.030(6) does not impermissibly burden the right to vote.[8]

C. *Alaska Statute 15.15.030(6) Does Not Violate Article I, Section 2 of the Alaska Constitution, which Requires that Government Be Based on the Will of the People, or Article II, Section 3 and Article III, Section 3 of the Alaska Constitution, which Require that Legislators and the Governor Be Elected* [9]

Sonneman argues that allocating all of the positional advantage by a random drawing is not an election, and is therefore inconsistent with the requirement that a candidate be elected dependent only upon the will of the people. He argues that allocating all of the positional bias to one candidate could determine the outcome of an election in Alaska because our political parties are relatively weak and because elections are often determined by a small number of votes.[10] The State argues that allocating all the positionally biased votes to one candidate does not affect the will of the people, because each voter may freely cast a vote for the candidate of his or her choice. Thus, even if a candidate is elected because of positional advantage, an election based on the will of the people has still occurred.

Sonneman's argument that determining ballot position by lot makes elections depend on random choice instead of an expression of the people's will has some support. *See Gould v. Grubb,* 14 Cal.3d 661, 122 Cal.Rptr. 377, 536 P.2d 1337, 1343 (Cal.1975) (stating that in close elections, positional bias may be the determining factor which "undermines the fundamental democratic electoral tenet of majority rule"); *see also Walsh v. Boyle,* 179 A.D. 582, 166 N.Y.S. 681, 687 (N.Y.App.Div. 1917) (Shearn, J., dissenting) (giving "sharp criticism of the method of determining the order of printing the names by lot as one calculated to make the election ... a sort of lottery, and ... illegal").

We find, however, that the allocation of ballot positions does not mean that the election is not based on the will of the people. Sonneman's argument could affect nearly any regulation, no matter how well justified, for all rules have the potential to tip the balance in a close election contest. Instead, the concept of the people's will encompasses all who vote, those who are careless and uninformed as well as those who are more

---

8. This holding also answers Sonneman's argument that the statute violates substantive due process, which requires that legislation be at least based on "some rational policy." *Keyes v. Humana Hosp. Alaska, Inc.,* 750 P.2d 343, 351–52 (Alaska 1988).

9. Article I, section 2 of the Alaska Constitution provides: "All political power is inherent in the people. All government originates with the people [and] is founded upon their will only...." Article II, section 3 and article III, section 3 require that legislators and the governor be elected at a general election.

10. Several factors, including party identification, are believed to diminish the effect of positional bias. *See, e.g., In re Election of Nov. 6, 1990,* 58 Ohio St.3d 103, 569 N.E.2d 447, 456 (Ohio 1991) (recognizing that other factors affect how much influence ballot rotation has, including: "party identification on the ballot, position of the race toward the top of the ballot, significant pre-election publicity, and the American practice of noncompulsory voting").

thoughtful and knowledgeable. In rejecting a similar election challenge, the Massachusetts Supreme Court stated:

> The voters were not misled. Failure to rotate the names did not lessen the opportunity of any voter to cast a vote for the candidate of his choice.... Even though we assume that the first ballot position of the incumbents deprived the plaintiffs of an equal chance to benefit from the indifference of careless voters who had no personal choice but marked the first name, that speculative benefit does not override the rights of informed and intelligent voters to have their votes counted as they were cast.

*Tsongas,* 291 N.E.2d at 152–53; *see also Bees v. Gilronan,* 116 N.E.2d 317, 321 (Ohio Com.Pl.1953) (noting that wherever a candidate's name appeared on the ballot, each voter could indicate his or her free choice); *New Alliance Party v. New York State Bd. of Elections,* 861 F.Supp. 282, 295 (S.D.N.Y. 1994) ("[A]ccess to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern.... The Constitution does not protect a plaintiff from the inadequacies or the irrationality of the voting public."). Regardless of where a candidate's name appears on the ballot, the people use free will in voting and the winner is elected based on their will only.[11]

## V. CONCLUSION

Sonneman has citizen-taxpayer standing to challenge the constitutionality of AS 15.15.030(6). Assuming that positional bias exists, the statute does not impermissibly burden the right to vote because it is a reasonable and nondiscriminatory restriction which is designed to promote the State's important interests in government economy and prevention of voter confusion. We further hold that the statute does not violate the "will of the people" or "election" clauses of the Alaska Constitution. We thus AFFIRM the superior court's grant of summary judgment to the State.

EASTAUGH, Justice, with whom COMPTON, Justice, joins, dissenting.

Given this court's underlying assumption that positional bias exists, I must dissent from its conclusion that, as a matter of law, AS 15.15.030(6) does not impermissibly burden the right to vote. Op. at 640. I cannot agree that the modest financial interest the State identifies is important enough to justify the burden the statute may impose.

For purposes of reviewing the superior court's grant of summary judgment to the State, this court forthrightly assumes that positional bias can affect at least five percent of the votes cast. Op. at 639 n. 7. This assumption, or at least an assumption that some positional bias exists, is mandated by the procedural posture of this case. Because the State submitted no admissible evidence supporting a finding that positional bias does not exist or cannot be measured, our starting point is Sonneman's complaint. It alleged that positional bias benefits whichever candidate is at the top of the ballot. It asserted that studies confirmed the existence of positional advantage, affecting as much as six to seven percent of the candidates' votes.

Despite the absence of admissible evidence rebutting the complaint's allegations of positional bias, the court concludes that the State is entitled to judgment as a matter of law; it necessarily reasons that Sonneman has raised no genuine fact that is material. Op. at 635–636, 641. In my view, the materiality of the factual dispute turns on whether the statute imposes an impermissible burden on the right to vote. If a five percent shift constitutes an impermissible burden, then the existence—and extent—of positional bias is a fact dispute that is necessarily material.

Positional bias could impose a serious burden on the right to vote. Many elections in

---

11. Because our decision assumes that positional bias is a verifiable phenomenon and that the likelihood of its occurrence under the ballot system adopted in AS 15.15.030(6) could be proved, we need not address Sonneman's claim that entry of summary judgment for the State was improper because he had raised a genuine issue of fact concerning the existence of positional bias.

this state have been decided by margins smaller than five percent. Our opinions reflect some of those contests. *See, e.g., Cissna v. Stout,* 931 P.2d 363, 364 (Alaska 1996) (affirming in election recount decided by one vote). Assuming the facts alleged by the complaint, positional bias alone could alter the outcome of all single-district races decided by margins of less than six percent.

The potentially significant effects of positional bias cannot be justified by the weak regulatory interests identified by the court. Op. at 639–640. On appeal, the State articulates only one interest: cost reduction. According to the court, the State saved an estimated $64,024 per election cycle by eliminating rotation in single-district races. Op. at 640. To me, the burden positional bias potentially imposes far outweighs savings of this magnitude.

The State also argued in the superior court that rotation would confuse voters by creating discrepancies between sample ballots and actual ballots. This court relies on that argument, even though the State has chosen not to assert it on appeal. Op. at 639–640. It seems unlikely that this is of significant continuing concern, given that sample ballots also reflect statewide races, for which rotation is still practiced. If confusion were of real concern, a clear disclaimer on sample ballots would cure it.

The interests the court identifies are minor in comparison with the burden we must assume the statute imposes on the right to vote. I would therefore remand for determination of whether positional bias exists, and the extent of its effect. Only then can a court decide whether the legislature's choice unreasonably burdened the right to vote.