[No. B156528. Second Dist., Div. One. Mar. 10, 2003.]

OMAR BRADLEY, Plaintiff and Respondent, v.
ERIC J. PERRODIN, Defendant and Appellant.

MELANIE ANDREWS, Plaintiff and Respondent, v.
LESLIE IRVING, Defendant and Appellant.

1154

COUNSEL

Strumwasser & Woocher, Fredric D. Woocher, Michael J. Strumwasser, Daniel J. Sharfstein and Lea Rappaport Geller for Defendant and Appellant Eric J. Perrodin.

Quinn Emanuel Urquhart Oliver & Hedges, Warrington S. Parker III and Lee J. Papageorge for Defendant and Appellant Leslie Irving.

Reed & Davidson, Dana W. Reed, Bradley W. Hertz; and Milton Grimes for Plaintiff and Respondent Omar Bradley.

Law Office of Gilbert Gaynor and Gilbert Gaynor for Plaintiff and Respondent Melanie Andrews.

OPINION

**ORTEGA, J.**—The hotly contested 2001 Compton municipal election resulted in two election contests challenging the results of the runoff election in the mayoral and city council races. The trial court granted both election contests, removing the winners from office and replacing them with their opponents. Finding the runoff ballot had listed the candidates' names in both races in the wrong alphabetical order, the trial court concluded that switching the name order would have changed the outcome of both races due to the advantage the top ballot placement affords over lower ballot placements. The trial court also granted the contest against the city council winner on the ground that she had committed offenses against the electorate.

With regard to the mayoral election, we reverse the judgment and reinstate the winning candidate as mayor. In the city council race, we affirm the portion of the judgment annulling the winning candidate's election for having committed offenses against the elective franchise. We reverse the portion of the judgment for the challenger based on name-order error.

BACKGROUND

The court held a consolidated trial of election contests brought by respondent Omar Bradley against appellant Eric J. Perrodin for the Compton Mayor's Office and by respondent Melanie Andrews against appellant Leslie Irving for a Compton City Council position. For the sake of convenience, we will discuss the contests separately although they involved overlapping issues and evidence.

A. *The Compton Mayoral Election (Perrodin's Appeal)*

Nine candidates, including Perrodin and Bradley, vied for mayor in Compton's primary election of April 2001. Compton City Clerk Charles Davis, the local elections official, listed the nine mayoral candidates on the primary ballot according to a randomized alphabet obtained from the Secretary of State. (See Elec. Code, §§ 13112, 13113.)[1] Pursuant to that randomized alphabet, Perrodin's name was listed above Bradley's on the primary ballot. There is no allegation that Davis erred in preparing the primary ballot.

The primary election failed to yield a majority of votes for any single candidate. Bradley, the incumbent mayor, finished first with 4,312 votes; Perrodin, a deputy district attorney and former police officer, came in second with 1,983 votes.

Davis prepared a ballot for the June 5, 2001, runoff election between Bradley and Perrodin, using the same randomized alphabet as in the primary election. Accordingly, the runoff ballot listed Perrodin's name above Bradley's.

On June 5, 2001, Perrodin won the mayoral runoff election with 5,472 votes to Bradley's 5,191 votes.

After the June runoff election, Bradley filed an election contest against Perrodin, with the following allegations: (1) Perrodin and others prepared fraudulent or counterfeit ballots for the runoff election; (2) Davis erred in failing to use the appropriate randomized alphabet for the June election that would have placed Bradley's name before Perrodin's on the runoff ballot; (3) Perrodin committed offenses against the elective franchise (§§ 16100, subd. (c), 18000 et seq.); (4) precinct board members committed malconduct (§ 16100, subd. (a)); and (5) illegal votes were cast (§ 16100, subd. (d)).

A lengthy court trial was held with 85 witnesses testifying over the course of several months. Of Bradley's numerous allegations, the trial court upheld only one, finding that Davis's failure to place Bradley's name above Perrodin's on the runoff ballot constituted grounds to void Perrodin's election and declare Bradley the new mayor. The trial court reasoned as follows: (1) the Elections Code required Davis to request a new randomized alphabet from the Secretary of State for the June runoff election; (2) had Davis made such a request, the Secretary of State would have provided the same randomized alphabet that had been drawn on March 12, 2001, for the Kern County

---

[1]Unless otherwise indicated, all further statutory references are to the Elections Code.

special election; (3) the randomized draw for the Kern County election would have required Davis to place Bradley's name above Perrodin's on the runoff ballot; and (4) due to the advantage that a top ballot position affords a candidate over lower placed candidates (the so-called primacy effect), Perrodin received at least 306 votes that would have gone to Bradley had Bradley's name been listed first.[2] Based on the primacy effect theory, the trial court shifted 306 votes from Perrodin to Bradley and declared Bradley the victor. The court rejected Perrodin's contention that Bradley's sole remedy to correct any name-order error on the ballot was to file a preelection writ petition. (§ 13314.)

The trial court rejected Bradley's remaining grounds for contesting the election. The court found: (1) no evidence of counterfeit or fraudulent ballots; (2) insufficient evidence that Perrodin committed offenses against the franchise;[3] (3) the precinct board did not commit malconduct and any procedural errors and irregularities were not the board's fault and did not affect the outcome of the election; (4) 144 illegal votes were cast, but it was impossible to determine (except for nine illegal votes that had been cast for the Perrodin slate)[4] for whom the illegal votes were cast; and (5) while Davis was careless in failing to follow proper election procedures, he did not willfully neglect or refuse to perform his duties.

Based solely on the primacy effect resulting from the order in which the two candidates' names were placed on the ballot, the trial court annulled Perrodin's certificate of election and ordered that a new certificate of election be issued to Bradley. The court entered judgment against Perrodin and declared Bradley to be mayor.

---

[2] The trial court based its 306-vote primacy effect finding on the expert testimony of Ohio State University Political Science Professor Jon Krosnick. Krosnick testified that based on his analysis of a 1992 election in Ohio, candidates listed first on a ballot receive on average 3.32 percent more votes over lower placed candidates. No direct evidence was presented at trial, however, that any particular voters in the Compton election were misled or confused by the placement of the names on the ballot and would have voted for Bradley had Bradley's name been listed above Perrodin's.

[3] Among the grounds rejected by the trial court was that Perrodin had violated section 18540 (compelling another to vote or not vote through force, violence, coercion or intimidation) by displaying a firearm to campaigning firefighters. On January 28, 2003, Bradley moved to remand the matter to the trial court to take additional evidence as to whether Perrodin had falsely testified to possessing a valid concealed weapon permit. On the same date, Bradley filed a supplemental request for judicial notice regarding the concealed weapon permit issue. On February 13, 2003, we denied both requests.

[4] Perrodin ran together as a slate with two city council candidates, Leslie Irving and Yvonne Arceneaux, and a candidate for treasurer, Douglas Sanders. The nine illegal votes for the Perrodin slate were cast by noncitizens who were found to have been illegally registered to vote by Irving or Irving's agents in violation of sections 18100, 18371, 18500, 18501, and 18561.

Bradley was sworn in as mayor on February 11, 2002. Thereafter, Perrodin appealed from the judgment and petitioned for a writ of supersedeas and immediate stay. We issued the writ and stay after requesting opposition and hearing oral argument. (*Bradley v. Perrodin* (Feb. 26, 2002, B156528).) On February 28, 2002, the California Supreme Court denied Bradley's application for stay and petition for review. (*Bradley v. Perrodin* (Feb. 28, 2002, S104699).) The judgment in favor of Bradley having been stayed pending resolution of Perrodin's appeal, Perrodin has been serving as mayor while this appeal was pending.

### B. *The Compton City Council Election (Irving's Appeal)*

Appellant Irving and respondent Andrews were the top candidates in one of two city council races in the April 2001 primary election. (The other council race, won by Yvonne Arceneaux in a runoff election against Frank K. Wheaton, is not at issue in this appeal.) In the June 5, 2001, runoff election, Irving defeated Andrews by a vote of 5,414 to 4,863.

Andrews then filed the present election contest against Irving, contending that Davis had erred by placing Irving's name above Andrews's on the runoff ballot. Andrews's position differed from Bradley's on this point in one significant respect. Unlike Bradley, Andrews contended that under *either* randomized alphabet at issue in this case—the one drawn for the *primary* election or the one drawn for the *Kern County* election—Andrews's name should have been first on the runoff ballot. In other words, under *both* randomized draws, "A" was to come before "I," so Andrews should have been listed before Irving no matter which draw was to be used.

Davis conceded below that Andrews's name should have been listed first under either of the two randomized alphabets at issue in this case. Davis stated, and the trial court agreed, that Irving's name was mistakenly placed before Andrews's due to Davis's unintentional error. The finding that Davis's error was unintentional is not disputed in this appeal.

Andrews also contended below that Irving had committed offenses against the elective franchise by soliciting (either personally or through her agents) nine noncitizens to register to vote, and by illegally influencing or instructing the nine noncitizens to vote for Irving.

The trial court, after rejecting Irving's argument that the ballot name-order error should have been addressed in a preelection writ proceeding (§ 13314), found the error sufficient to overturn Irving's election. The court shifted 295

votes from Irving to Andrews based, as in the mayoral election contest, on the primacy effect theory,[5] and declared Andrews the winner.

In addition, the trial court found Irving had committed offenses against the elective franchise, either personally or through her agents, by: (1) knowingly soliciting nine noncitizens to register for absentee ballots in violation of section 18100, subdivision (a); (2) being present in the nine absentee voters' homes while they were voting and telling them how to vote, in violation of section 18371, subdivision (a); (3) fraudulently registering the nine noncitizens and assisting them to vote or completing their absentee ballots for them, in violation of section 18500; and (4) soliciting illegal votes from the nine nonqualified voters, in violation of section 18561. The trial court also declared Irving, having committed offenses against the electorate while holding public office, was barred under the disqualification provisions of section 18501, from ever holding office in California.[6]

Irving appealed from the adverse judgment and petitioned for a writ of supersedeas. We denied the petition on March 7, 2002. (*Wheaton v. Arceneaux* (Mar. 7, 2002, B156528).) Accordingly, Andrews has been serving on the city council while this appeal was pending.

DISCUSSION

I

*The Bradley-Perrodin Election*

Section 13112 requires the Secretary of State to conduct randomized alphabet draws for five major election dates, including the first Tuesday after the first Monday in June of odd-numbered years (§ 13112, subd. (b)(1)(D)). ▉ Bradley contends that because the Compton June 5, 2001, election fell on the first Tuesday after the first Monday in June of an

---

[5]Again, the trial court based its primacy effect finding solely on Krosnick's expert testimony that on average, those listed first on a ballot receive 3.32 percent more votes. There was no direct evidence from any voter regarding the effect of the name-order error on the voter's selection of a candidate.

[6]Irving was a member of the Compton Community College District Board at the time of her election to city council. Section 18501 provides: "Any public official who knowingly violates any of the provisions of this chapter, and thereby aids in any way the illegal casting or attempting to cast a vote, or who connives to nullify any of the provisions of this chapter in order that fraud may be perpetrated, shall forever be disqualified from holding office in this state and upon conviction shall be sentenced to a state prison for 16 months or two or three years."

odd-numbered year, Davis erred in failing to request the randomized alphabet drawn for that date by the Secretary of State under section 13112, subdivision (b)(1)(D).[7]

Perrodin contends a *runoff* election in a *charter city* like Compton is not a separate election for which a new randomized alphabet is required under the Elections Code. Under sections 13112, subdivision (b)(2) and 13113, a charter city may request a new randomized alphabet when the "last possible day to file nomination papers for the local election would occur after the date of the drawing for" one of the five major election dates. (§ 13112, subd. (b)(2).) Perrodin claims that because the June 5 election was a *runoff* election, for which there was *no* "last possible date for filing" (§ 13113, subd. (a)), the same randomized alphabet was properly used in both primary and runoff elections. Perrodin further relies upon a 1983 letter, in which the Secretary of State informed the City of Compton that the same randomized alphabet was to be used for its primary and general elections.[8] (See *Andal v. Miller* (1994) 28 Cal.App.4th 358, 364, fn. 3 [34 Cal.Rptr.2d 88] [The contemporaneous construction of a statute by the administrative agency charged with its enforcement is entitled to great weight.].)

---

[7]Evidence was presented below that no drawing was held by the Secretary of State under section 13112, subdivision (b)(1)(D) in 2001 because there was no county holding an election on June 5, 2001. Perrodin contends the absence of a draw under subdivision (b)(1)(D) supports his position that Davis properly used the same draw for the primary and runoff elections. Bradley, on the other hand, contends that, had Davis requested a randomized draw for the runoff election, the Secretary of State would have provided the randomized alphabet drawn for the Kern County special election. Given our determination that no new draw was required, we need not decide whether the Kern County draw would have been provided had a request been made.

[8]Bradley contends that when the Secretary of State's 1983 letter was written, the June election date was *not* one of the established election dates listed in section 13112's predecessor statutes. According to Bradley, the subsequent addition of the June election date to section 13112 invalidated the Secretary of State's 1983 letter as authority for the position that the same randomized alphabet was properly used for the April primary and June runoff elections.

Perrodin disagrees with Bradley's statutory analysis and requests that we take judicial notice of section 13112's predecessor statutes (former §§ 2500, 1000), which included the June election date as an established election date. Perrodin states that "[i]n 1983, the 'established election dates' under section 1000's predecessor, section 2500, included 'the first Tuesday after the first Monday in *June of each year*.' (West's Ann. Cal. Elec. Code, § 2500(3) (1977 & Supp. 1987) (emphasis added) . . . . As the 1999 legislation reinstating June elections in odd-numbered years to section 1000 explains, those elections had inadvertently been deleted as 'established election dates' in 1998 when the Legislature moved the statewide primary date from June to March in each even-numbered year; all that the 1999 legislation did was to '*restore*[] the first Tuesday after the first Monday in June as a regular election date of each odd-numbered year.' (Stats. 1999, ch. 6 (A.B. 22) (emphasis added) . . . ."

Given our determination that sections 13112 and 13113 do not require new randomized alphabets for the second round of voting in a single election, whether the June election date was an established election date in 1983 is a moot point, as is Perrodin's request for judicial notice of former sections 2500 and 1000.

Perrodin also notes that like Compton, the cities of Los Angeles, Long Beach, Burbank, Inglewood, Redondo Beach, and Pasadena all use the *same* randomized alphabet in both primary and general elections. In addition, Perrodin points out that section 13112, subdivision (d) requires use of the *same* randomized alphabet in both primary and special elections for state Assembly, state Senate, and congressional representative.

We granted Perrodin's request to take judicial notice of a March 19, 2002, letter from the Secretary of State's Elections Counsel Stephen N. Trout, advising the City of Long Beach to use the *same* randomized alphabet for both the Long Beach April 2002 primary election and the Long Beach June 2002 general election. Trout's letter explained that the same draw could be used on both ballots because "no candidates other than those qualified to appear on the ballot in the Primary Nominating Election will be qualified for the General Municipal Election."

A runoff election, as Perrodin correctly points out, is merely the second round of voting in a *single* election. (*Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 174 [126 Cal.Rptr.2d 727, 56 P.3d 1029].) If one of the candidates receives a majority of the votes cast in the primary election, there is no need for a runoff election. Where no majority is achieved in the primary election, only those candidates who qualify in the primary election may participate in the runoff election. There is no new filing period for a runoff election.

We agree with Perrodin that nothing in sections 13112 and 13113 required the Compton clerk to request a new randomized alphabet for the June 5 runoff election, which was simply a continuation of the April primary election. Under section 13112, subdivision (b)(1)(D), a random drawing for a June 5 election must be conducted 82 days earlier, on March 15. On this record, however, it was uncertain on March 15 whether a June 5 runoff election would even be necessary and, if so, between which candidates. We see nothing in section 13112 or 13113 that would require the clerk to ask the Secretary of State to conduct a March 15 drawing for a June 5 runoff election that may or may not occur depending on the outcome of an April primary election.

As we understand the statutory scheme, a new randomized alphabet is not required for a runoff election with no new filing period or new candidates. As there was no new filing period for Compton's June 5 runoff election, and only the top two contestants in the primary election were eligible to participate in the mayoral runoff election, we find the clerk had no statutory obligation to request a new randomized alphabet for the June 5 election. The

statutory requirements for requesting randomized alphabets simply do not fit the circumstances of this case. Section 13112, subdivision (b)(2) states that when a charter city schedules an election on one of the five major election dates, "and the last possible day to file nomination papers for the local election would occur after the date of the drawing for the major election date, the procedure set forth in Section 13113 shall apply." Under section 13113, the charter city must notify the Secretary of State of the local election date and the last possible date to file for that election. Section 13113 requires the Secretary of State to then conduct a randomized drawing on the first weekday following the last possible date of filing. As it was impossible to file nomination papers for the Compton June 5 runoff election, we find the procedures of sections 13112 and 13113 inapplicable to the June 5 runoff election.

Given our determination that the statutory scheme does not prohibit use of the same randomized alphabet for both the primary and runoff rounds of voting in a single election, we conclude Perrodin's name was properly listed before Bradley's on the runoff ballot. As no factual basis (name-order error) exists to support Bradley's equal protection violation claim[9] or the trial court's shifting of votes from Perrodin to Bradley under the primacy effect theory, those issues need not be addressed in relation to Bradley's appeal. We note, however, that as discussed below in part III regarding the judgment for Andrews, even if Bradley's and Perrodin's names were erroneously reversed on the runoff ballot, the primacy effect theory would not justify shifting 306 votes from Perrodin to Bradley.

---

[9]If Bradley is asserting that the use of the same randomized alphabet for the primary and runoff ballots constituted an equal protection violation, independent of any statutory violation, we also reject his claim. Bradley has cited no valid authority for the proposition that using the same random alphabetization in both the primary and runoff phases of a single election violates equal protection requirements.

*Gould v. Grubb* (1975) 14 Cal.3d 661 [122 Cal.Rptr. 377, 536 P.2d 1337], upon which Bradley relies, is readily distinguishable. The city charter provision at issue in *Gould* required that any incumbent seeking reelection automatically be given the advantageous top ballot position. The Supreme Court invalidated this provision in *Gould* as unconstitutional, finding "that any procedure which allocates such advantageous positions to a particular class of candidates inevitably discriminates against voters supporting all other candidates, and accordingly can only be sustained if necessary to further a compelling governmental interest. Applying this test, we conclude that the city has demonstrated no compelling interest which necessitates the provision's discriminatory classification scheme and thus we uphold the trial court's determination of invalidity." (*Id.* at p. 664.)

In this case, on the other hand, no particular class of candidates, such as incumbents, automatically receives the advantageous top ballot position. Instead, the candidates are placed on the runoff ballot according to the randomized alphabetization drawn for that election by the Secretary of State. It appears Bradley's quarrel with using the same randomized alphabet for the runoff election is that he considers the runoff election to be a new and separate election which is independent of the primary election. As we have discussed, however, there is no new filing period for the runoff election, which is simply the second round of voting in a single election. (*Edelstein v. City and County of San Francisco, supra,* 29 Cal.4th at p. 174.)

We conclude the trial court erred in entering judgment against Perrodin and for Bradley, and reverse that portion of the judgment.

Perrodin has requested costs and attorney fees on appeal. Although Perrodin is entitled to costs, we deny his request for private attorney general fees on appeal. (Code Civ. Proc., § 1021.5.)[10] ■ Perrodin contends his successful appeal has resulted in the enforcement of an important right affecting the public interest and has conferred a significant benefit on the public, namely "the fundamental right of self-determination for the citizens of Compton." That same fundamental right, however, exists in each and every election contest. To recover private attorney general fees, "[t]he claimant's objective in the litigation must go beyond—'transcend'—those things that concretely, specifically and significantly affect the litigant . . . , to affect the broader world or 'general public' as the statute puts it." (*Hammond v. Agran* (2002) 99 Cal.App.4th 115, 127 [120 Cal.Rptr.2d 646].) Attorney fees connected to a candidate's "quest for elective office," on the other hand, do not transcend the candidate's "palpable personal stake in the . . . election." (*Id.* at p. 128.) Accordingly, we deny Perrodin's request for attorney fees.

## II

### *The Irving-Andrews Election*

Section 16100, subdivision (c) provides that an election contest may be brought on the ground "[t]hat the defendant . . . has committed any other offense against the elective franchise defined in Division 18 (commencing with Section 18000)." In this case, the trial court found that Irving had committed offenses against the elective franchise in violation of four sections in division 18 by: (1) knowingly soliciting nine noncitizens to register to vote by absentee ballot in violation of section 18100, subdivision (a); (2) being present in the nine absentee voters' homes while they were voting and telling them how to vote in violation of section 18371, subdivision (a); (3) fraudulently registering the nine noncitizens and assisting them to vote or voting for them in violation of section 18500; and (4) soliciting illegal votes from the nine nonqualified voters in violation of section 18561.

---

[10]Code of Civil Procedure section 1021.5 provides in part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

Irving contends on appeal that "there is no consistent evidence that Irving participated *personally* in any of the alleged fraudulent acts." (Some capitalization omitted.) Irving claims "that *at most,* there were nine witnesses who could connect Irving to a handful of the acts the trial court considered fraudulent." Irving points out that the nine witnesses were Spanish speaking and their alleged conversations with her took place through an interpreter (Irving's sister). Irving maintains there is no evidence that Irving speaks or understands Spanish, or knew the witnesses were not citizens. Irving also points to the relatively weak eyewitness identification of Irving by some of the nine witnesses. According to Irving, "A review of the nine witnesses['] testimony reveals that *only five* could make *any* identification of Irving, and this only relating to the initial visit seeking registration. And even among those five, the identifications differ in more than 'minor' detail[.]"

The trial court weighed all of the evidence, however, and concluded, based upon substantial and credible testimony, that Irving had committed offenses against the elective franchise. "Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact." (Evid. Code, § 411; see 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, §§ 89-94, pp. 123-130.) ▮ " 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]' [Citations.]" (*People v. Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; *People v. Martinez* (1999) 20 Cal.4th 225 [83 Cal.Rptr.2d 533, 973 P.2d 512].)

In this case, the testimony of Elvita Andrade, which was similar in many respects to that of the other eight witnesses, is sufficient to uphold the trial court's finding that Irving had committed offenses against the franchise. Andrade testified that although she had spoken with Irving through a translator, she had also spoken directly with Irving in English. Andrade stated she had told Irving, in English, that she is not a United States citizen. Andrade explained that Irving's response was "that [citizenship] had nothing to do

with it. That it had nothing to do with the government, so that it would not [a]ffect my citizenship. [¶] That it was just for the school. [¶] . . . [¶] . . . Because this was to help the kids." Andrade said she had been told to sign an absentee ballot application, which she did, and that either Irving or the translator would pick up the absentee ballot from her when it arrived. Andrade stated that when the translator came to pick up Andrade's absentee ballot, she (Andrade) had signed the ballot and given it to the translator without marking (or punching) it. Someone other than Andrade, presumably someone connected with Irving's campaign, marked and submitted Andrade's absentee ballot, which was counted in the election.

■ When an otherwise successful candidate such as Irving is subsequently found to have committed an offense or offenses against the elective franchise, her election may be annulled even if the number of unqualified voters she fraudulently registered or the number of votes she unlawfully solicited were too few to have changed the outcome of the election. As the California Supreme Court explained: "Each . . . 'offense against the elective franchise defined in Division 17 [now 18]' of the Elections Code . . . can furnish independent statutory grounds for contesting and annulling the election, separate and apart from the effects of any illegal votes actually counted. ([Former] § 20021, subd. (c)[, now § 16100, subd. (c)]; see *Stebbins v. White* (1987) 190 Cal.App.3d 769, 788-791 [235 Cal.Rptr. 656].)" (*Gooch v. Hendrix* (1993) 5 Cal.4th 266, 275, fn. 4 [19 Cal.Rptr.2d 712, 851 P.2d 1321].)

■ Irving contends her election may only be annulled under section 16100, subdivision (c) for having committed offenses against the electorate if: (1) she was found to have committed bribery for the purpose of winning the election, (2) there is substantial evidence her unlawful conduct changed the results of the election, or (3) there is substantial evidence that fraud permeated the election. We find no merit in any of these contentions.

Regarding her claim that bribery is a prerequisite for annulling her election, Irving cites *Salazar v. City of Montebello* (1987) 190 Cal.App.3d 953 [235 Cal.Rptr. 708]. *Salazar,* which predates *Gooch v. Hendrix, supra,* 5 Cal.4th 266, held that a specific finding of *bribery* is required to annul the election of a candidate whose offenses against the electorate did not change the election result. (*Salazar v. City of Montebello, supra,* 190 Cal.App.3d at p. 960.)

*Salazar* relied upon *Canales v. City of Alviso* (1970) 3 Cal.3d 118, 129-130 [89 Cal.Rptr. 601, 474 P.2d 417], a *ballot measure* election contest in which the measure's proponents had committed offenses against the electorate.

*Canales* held that the result of a ballot measure election should not be annulled for the misdeeds of the measure's proponents, "unless the misdeeds affected the outcome. In a footnote, the Court [in *Canales*] left undecided whether a showing that a candidate is responsible for the misdeeds is sufficient to disqualify him absent a showing that the result was affected. 'Perhaps the absence of a statutory requirement of a showing that bribery affected the result is explained by the fact that a candidate who is *convicted* of bribery is thereby rendered ineligible for office. (Cal. Const., art. XX, § 10.) We need not now decide whether a showing by a preponderance of evidence that a candidate is responsible for misdeeds specified in section 20021 [now section 16100], subdivision (c), is sufficient to invalidate an election absent both a conviction and a demonstration that the misdeeds determined the result of the election. [Citation.]' ([*Canales v. City of Alviso, supra,* 3 Cal.3d] at p. 130, fn. 5, italics in original.)" (*Stebbins v. White* (1987) 190 Cal.App.3d 769, 788-789, fn. omitted.)

Nothing in *Canales*, which dealt with a ballot measure, required *Salazar* to hold that a *candidate's* offense which failed to change the election result will result in annulment only if the offense was bribery. The most that can be said about *Canales* on this point is that the Supreme Court did not decide whether a *candidate's* election may be annulled for an offense that failed to change the election result. That question was again mentioned by the Supreme Court in *Gooch v. Hendrix, supra,* 5 Cal.4th at page 275, footnote 4, when it cited *Stebbins v. White, supra,* 190 Cal.App.3d at pages 788-791, with approval.

*Stebbins* found it permissible under section 16100, subdivision (c) to annul the election of a *candidate* whose offenses against the electorate did not change the election result. (*Stebbins v. White, supra,* 190 Cal.App.3d at p. 790.) *Stebbins* explained: "The grounds for contesting an election are set out in Elections Code section 20021 [now section 16100] and the court is explicitly authorized to pronounce judgment in a contested election proceeding 'either confirming or annulling and setting aside the election.' (Elec. Code, § 20086 [now § 16603].) Thus the question is not whether the court is authorized to annul an election on one of the statutory grounds of contest but is rather whether there is some other statutory restriction decreeing that an election cannot be annulled unless the criminally obtained votes would change the election result. Since there is no such statutory restriction, we conclude that a violation of Elections Code section 20021, subdivision (c) [now section 16100] by the person whose election is contested constitutes grounds for annulling his election." (*Ibid.*)

In *Gooch v. Hendrix, supra,* 5 Cal.4th at page 275, footnote 4, the Supreme Court implicitly disagreed with *Salazar*'s bribery requirement language by

citing *Stebbins* with approval and stating: "Each constitutes an 'offense against the elective franchise defined in Division 17' of the Elections Code, violations of which themselves can furnish independent statutory grounds for contesting and annulling the election, separate and apart from the effects of any illegal votes actually counted. (§ 20021, subd. (c); see *Stebbins* v. *White*[, *supra*,] 190 Cal.App.3d 769, 788-791 . . . .)"

Notwithstanding the above quoted language from *Gooch*, Irving argues that *Gooch* requires a finding that *fraud permeated the election* before her election may be annulled. *Gooch*, however, involved an election contest primarily brought against 12 school board candidates under former section 20024 (now § 16203), on the basis of illegal votes. (*Gooch v. Hendrix, supra*, 5 Cal.4th at pp. 274-275, fn. 4, 285.) The illegal votes in *Gooch* were cast by absentee voters whose ballot applications had been solicited by members of a voter education project called the Black American Political Association of California (BAPAC). When the absentee ballots arrived, the voters were encouraged to vote in the presence of the BAPAC solicitor, who would offer advice on the candidates or issues. Although it was impossible to determine for which candidates the illegal votes were cast, the Supreme Court found sufficient uncontroverted circumstantial evidence that the illegal votes had affected the outcome of the election to justify annulling all of the election results. (*Id.* at p. 285.) The Supreme Court explained: "We do not believe the Legislature intended that under circumstances such as these, where clear and convincing evidence established pervasive illegalities that permeated the election process, and where, although it cannot be determined on a vote-by-vote basis for whom the illegal votes were cast, it nonetheless 'appears' the illegal votes affected the outcome of the election, a trial court is without authority to annul and set aside the election results within its discretion under section 20086 [now section 16603]." (*Id.* at p. 282.)

*Gooch*, contrary to Irving's position, did not hold that a candidate's offenses against the electorate will result in annulment only if the offenses changed the outcome or fraud so permeated the election process that it appears the illegal votes affected the outcome of the election. Although there was evidence in *Gooch* that some of the candidates had committed offenses against the electorate (two school board candidates were among the BAPAC solicitors who engaged in the unlawful solicitation of votes (*Gooch v. Hendrix, supra*, 5 Cal.4th at p. 274); "[]at least 4 of the 12 defendant-candidates were members of BAPAC; 11 of the 12 had been given BAPAC absentee ballots for delivery to the voters[]" (*id.* at p. 281)), the Supreme Court declined to review the finding that some candidates' offenses against the elective franchise "furnished a separate and independent basis for annulling the election results. (See *ante*, at pp. 274-275, and fn. 4.)" (*Id.* at p. 285,

fn. 10.) Instead, the Supreme Court annulled the entire election as to all candidates, including those who were innocent of having committed misdeeds; based on circumstantial evidence that the illegal votes had changed the election results. In short, *Gooch* is not inconsistent with our determination that Irving's misdeeds, even though they did not change the election results, properly resulted in the annulment of her election.

We conclude, under subdivision (c) of section 16100, Irving's election was properly annulled based on the finding, which was supported by substantial evidence, that she had committed offenses against the franchise. The trial court properly annulled Irving's election under section 16100, subdivision (c) despite the lack of evidence that Irving's offenses changed the outcome of the election. (*Gooch v. Hendrix, supra,* 5 Cal.4th at p. 275, fn. 4; *Stebbins v. White, supra,* 190 Cal.App.3d at pp. 788-791.) We affirm the portion of the judgment annulling Irving's election under section 16100, subdivision (c).

### III

### *The Judgment for Andrews*

 Although we agree Irving's election was properly annulled, we disagree that judgment was properly entered for Andrews, who was judicially declared elected despite her failure to win the highest number of legal votes in the June runoff election. Under section 16603, having found Irving, the winning candidate, disqualified for having committed misdeeds that failed to change the result of the election, the trial court should have entered judgment "annulling *and setting aside* the election." (§ 16603, italics added.) The Elections Code does not permit the trial court to annul the election of the winning candidate, based on offenses that did not change the result of the election, and then declare another candidate elected by shifting legal votes between the two candidates under the primacy effect theory. Having annulled the winning candidate's election for misdeeds that did not change the election results, the court should have annulled *and set aside* the runoff election under section 16603.

 Andrews contends the judgment declaring her elected may not be reviewed on Irving's appeal because Irving, whose "election was properly annulled by the trial court, . . . has no justiciable interest as a candidate to protect as a basis for challenging the remainder of the court's order relating to the seat for which she ran." (Emphasis omitted.) Citing *Pierce v. Harrold*

(1982) 138 Cal.App.3d 415 [188 Cal.Rptr. 458],[11] Andrews contends that once Irving's election was annulled, Irving lost standing to challenge the portion of the judgment awarding the seat to Andrews, contrary to the election results, under the primacy effect theory.

The question of who, if anyone, was duly elected to the city council seat in the runoff election is central to Andrews's election contest against Irving. As the candidate with the highest number of legal votes in the runoff election, Irving's interest was injured by the shifting of legal votes from Irving to Andrews. In that regard, Irving is an aggrieved party entitled to be heard on appeal on the primacy effect issue. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 181, p. 237.) In another regard, however, Irving's personal interest in the primacy effect issue was mooted by her disqualification from office under section 16100, subdivision (c).

Given that this election contest involves questions broader than Irving's personal interest as a candidate for the contested office, we conclude the electorate's interest in this important legal issue requires that the primacy effect issue be addressed.[12] Election contests are not typical adversary proceedings "between individuals asserting personal rights or interests, but involve the right of the people to have the fact as to who has been duly elected by them judicially determined. An election contest involves a question of broader import than the mere individual claim of a person to enjoy the honors and emoluments of a particular office brought directly into contest. The inquiry must be as to whether in a given instance the popular will has been, or is about to be, thwarted by mistake or fraud. The public interest imperatively requires that the ultimate determination of the contest shall reach the right result." (28 Cal.Jur.3d (1986) Elections, § 221, pp. 727-728, fns. omitted.)

Turning to the merits of Irving's contentions, we find that by shifting votes from Irving to Andrews based solely on the primacy effect

---

[11]In *Pierce,* an election contest was successfully brought against Joanne K. Harrold, the winner of a judicial seat in a primary election who was disqualified for having committed the offense of filing a knowingly false declaration of candidacy. (§ 16100, subd. (c).) Harrold's election was annulled and a new election was called in which Harrold was prohibited from running for the same seat. On appeal, the court found Harrold lacked standing to challenge the portion of the order prohibiting her from running for the same seat, stating that Harrold "had and continues to have no justiciable interest in the order calling for the November 2, 1982 election. . . . [N]ow that her election to the office has been adjudged a nullity, she has no interest as a candidate to protect as a basis for challenging that portion of the court's order." (*Pierce v. Harrold, supra,* 138 Cal.App.3d at p. 432.)

[12]Moreover, whether we reached the primacy effect issue in the context of Bradley's appeal, where the issue was also raised, or in this appeal makes no difference because our legal determination of the same issue would obviously apply to both appeals.

theory, the trial court exceeded its authority. Under sections 16203, 16402, and 16703, only *illegal* votes may be discarded in an election contest.[13] If the court finds, after discarding the illegal votes given for the winning candidate, that another candidate "has the highest number of legal votes, the court shall declare that person elected." (§ 16703.) Otherwise, if discarding the illegal votes given for the winning candidate would not change the result of the election, and the winning candidate is disqualified from taking office due to having committed offenses against the elective franchise, the court shall enter judgment "annulling and setting aside the election." (§ 16603.)

In this case, the trial court found a total of 144 illegal votes had been cast in the runoff election, but found it impossible to determine in whose favor (other than the nine illegal votes for Irving) the illegal votes had been cast. Even if we were to assume that all 144 illegal votes had been cast for Irving, subtracting 144 illegal votes from Irving's total would still have left her the victor with 5,270 legal votes to Andrews's 4,863 legal votes. Therefore, the illegal votes cast for Irving did not change the result of the election, and there was no other candidate with more legal votes than Irving. Given Irving's disqualification from taking office due to her offenses against the elective franchise, the trial court should have entered a judgment "annulling *and setting aside* the election." (§ 16603, italics added.)

Instead, in a ruling unprecedented, to our knowledge, in this country, the trial court shifted 295 legal votes from Irving to Andrews based solely on the 3.32 percent primacy effect assumed to be enjoyed, on average, by those listed first on the ballot. While many courts and legislatures have recognized the advantage afforded to candidates whose names are listed first on the ballot, no judicial or statutory authority exists to reverse the results of an election where, due to *unintentional* clerical error, the ballot listed the candidates in the wrong alphabetical order.

---

[13]Section 16203 states in part: "An election shall not be set aside on account of illegal votes, unless it appears that a number of illegal votes has been given to the person whose right to the office is contested . . . which, if taken from him, would reduce the number of his legal votes below the number of votes given to some other person for the same office, after deducting therefrom the illegal votes which may be shown to have been given to that other person."

Section 16402 states: "When the reception of illegal votes is alleged as a cause of contest, it is sufficient to state generally that in one or more specified voting precincts illegal votes were given to the defendant, which, if taken from him or her, will reduce the number of his or her legal votes below the number of legal votes given to some other person for the same office. [¶] Testimony shall not be received of any illegal votes, unless the contestant delivers to the defendant, at least three days before the trial, a written list of the number of illegal votes, and by whom given, which he or she intends to prove. No testimony may be received of any illegal votes except those that are specified in the list."

Section 16703 states: "If in any election contest it appears that another person than the defendant has the highest number of *legal* votes, the court shall declare that person elected." (Italics added.)

Election results may only be challenged on one of the grounds specified in section 16100. (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 192 [105 Cal.Rptr.2d 214, 19 P.3d 567].) Name-order error occurring in the absence of fraud and resulting purely from unintentional clerical error, as in this case, is not a valid ground for an election contest under section 16100. The fact that 295 legal votes may have been cast for Irving solely because her name was erroneously listed first on the ballot does not, in itself, impeach the integrity of those 295 votes. Legal votes randomly cast by the least informed or least interested voters are entitled to the same weight as legal votes cast by the most highly educated and informed voters in our society. The legality or illegality of a vote cast by a qualified voter in a lawful manner does not depend upon the voter's motive or purpose in voting a certain way. (See *Bush v. Head* (1908) 154 Cal. 277, 281-282 [97 P. 512].) To shift 295 legal votes to "correct" the votes "randomly" cast for Irving solely as a result of her erroneous advantageous ballot position (and to award those same "random" votes to Andrews based solely on the primacy effect theory) would be, without any lawful justification, to disenfranchise those 295 voters. (See *Shinn v. Heusner* (1949) 91 Cal.App.2d 248, 252 [204 P.2d 886] [To invalidate lawfully cast absentee votes "would be, without warrant, to disfranchise these voters."]; *Dennen v. Jastro* (1913) 23 Cal.App. 264, 267 [137 P. 1069] [Clerk's inadvertent error in listing the same candidate twice, as the nominee of two different political parties, "should not disenfranchise the entire vote of the district and vitiate the election, unless it be made to appear that by reason of the irregularity the result was different from what it would otherwise have been, or that it prevented the voter from freely, fairly, and honestly expressing his choice of the candidate for the office."]; *Nelson v. Robinson* (Fla.Dist.Ct.App. 1974) 301 So.2d 508 [A candidate's unfavorable ballot position which allowed voters to exercise free choice after a reasonable study of the ballot, does not constitute a violation of equal protection.]; *Roberts v. Byrd* (Ky. 1961) 344 S.W.2d 378, 381 [Clerk's failure to rotate names every 50 ballots did not void the election.]; *Bees v. Gilronan* (1953) 66 Ohio L. Abs. 130 [116 N.E.2d 317] [In the absence of fraud, election officials' failure to properly rotate candidates' names on the voting machine ballots did not invalidate the election.].)

We conclude the trial court erred in entering judgment for Andrews and declaring her elected when she had failed to win the highest number of legal votes in the June 5, 2001, election. Accordingly, we reverse the judgment in favor of Andrews.

IV

*The Vacant Council Seat*

Under Government Code section 1770, an office becomes vacant when, among other circumstances, the officer is removed from office (Gov. Code,

§ 1770, subd. (d)), or a court declares the officer's election or appointment to be void (*id.* at subd. (j)). In this case, Andrews has been serving as city council member based on the trial court's erroneous judgment declaring her elected under the primacy effect theory. But having failed to win the highest number of legal votes, Andrews should not have been declared elected under section 16703. (See 28 Cal.Jur.3d, *supra,* at § 255, p. 765 ["The decision of a competent tribunal declaring an election void results in the office becoming vacant. Thus, where the court annuls the defendant's election because he or she committed an offense against the elective franchise, or because he or she is ineligible, it is not authorized to declare anyone else elected. The defendant's disqualification does not render the votes for the defendant illegal and require that his or her votes be disregarded and that the election be given to the candidate with the next highest number of votes. In such a case the office is vacant and must be filled in the manner provided by law." (Fns. omitted.)].)

Accordingly, once this court's opinion reversing the judgment for Andrews becomes final, Andrews's "election" will be annulled and her seat will be vacant.

## V

### *Irving's Lifetime Disqualification*

Section 18501 states that "[a]ny public official who knowingly violates any of the provisions of this chapter, and thereby aids in any way the illegal casting or attempting to cast a vote, or who connives to nullify any of the provisions of this chapter in order that fraud may be perpetrated, shall forever be disqualified from holding office in this state and upon conviction shall be sentenced to a state prison for 16 months or two or three years." In this case, the record contains no evidence that Irving was convicted under section 18501 or any other provision of chapter 6 (Corruption of the Voting Process) of division 18 (Penal Provisions) of the Elections Code. Irving contends that in the absence of a criminal conviction under chapter 6 of division 18 of the Elections Code, the trial court erred in declaring her to be forever disqualified under section 18501 from holding public office.

Having determined in part II of this opinion that Irving's city council election was properly annulled under section 16100, subdivision (c) due to her commission of offenses against the elective franchise, we conclude Irving is disqualified from seeking or filling the council seat she had sought

in the 2001 election, for the remainder of that 2001 term. In other words, Irving is ineligible to fill Andrews's vacant city council position. (*Pierce v. Harrold, supra,* 138 Cal.App.3d at p. 434.)

Irving's right to run for *other* terms of public office in *future* elections, however, is a separate issue. Irving contends the lifetime ban of section 18501 does not apply in the absence of a criminal conviction of a chapter 6 offense. Andrews, on the other hand, points out that section 18501 on its face fails to link imposition of the lifetime ban with a conviction under chapter 6, whereas it specifically links imposition of a state prison sentence with such a conviction. Andrews argues that because disqualification from public office is a civil, not criminal, penalty, section 18501 imposes both civil and criminal penalties. Under the civil aspect of the statute, according to Andrews, the trial court properly imposed a lifetime ban against Irving upon finding, in the civil context of the elections contest, that she was a public official who had committed offenses against the franchise and, thus, had violated section 18501.

While disqualification from public office is a "civil disability" (*Lubin v. Wilson* (1991) 232 Cal.App.3d 1422, 1430 [284 Cal.Rptr. 70]), it is also true that disqualification is a civil penalty or " 'consequence which flows' from the judgment of a felony conviction. [Citation.]" (*Ibid.*) Violation of section 18501 is a felony punishable by a state prison term of 16 months or two or three years. (See Pen. Code, § 17, subd. (a) [crimes punishable by death or imprisonment in state prison are felonies].) Section 18501 is found in chapter 6, entitled "Corruption of the Voting Process," of division 18, entitled "Penal Provisions," along with other *criminal* statutes. Section 18501 is *not* located in division 16, entitled "Elections Contests," where section 16100 is found. Proving that a candidate's election should be annulled in a civil action due to her commission of an offense against the elective franchise (§ 16100, subd. (c)) is not the same as proving the candidate is a public official who has committed a *felony* under section 18501.

We reject Andrews's invitation to parse the language of section 18501 in a manner that wholly ignores the section's placement with penal, not civil, statutes in division 18 of the Elections Code. We conclude the only reasonable and practical construction of section 18501 is to determine its lifetime disqualification penalty flows solely from a felony conviction under that statute.

*Pierce v. Harrold, supra,* 138 Cal.App.3d 415 supports our view. Harrold contended on appeal that her election could only be annulled under former

section 20021 (presently § 16100), subdivision (c), following a criminal conviction of an offense against the electorate. The appellate court rejected this contention, reasoning in part that because election contests must be filed within a relatively short time period, "to make conviction of an offense a condition precedent even to initiating an election contest would represent an absurd contradiction in legislative policy. As contestants observe, 'It does not require extended discussion of the realities relating to the time needed to prosecute even the least complex criminal case to compel the conclusion that the conviction requirement would render contests under . . . Section 20021(c) virtually [impossible to accomplish within the applicable statue of limitations.]' " (*Pierce v. Harrold, supra,* 138 Cal.App.3d at p. 426.)

The *Pierce* court held that although Harrold's disqualification might not extend to the next election in 1988, it extended to the upcoming November 1982 general election, which was a continuation of the June 1982 primary election from which Harrold was disqualified. (*Pierce v. Harrold, supra,* 138 Cal.App.3d at p. 434.) We find *Pierce* persuasive. In the absence of a felony conviction under section 18501, Irving's disqualification under section 16100, subdivision (c) extends only throughout the term covered by the 2001 election. Accordingly, we reverse the portion of the judgment imposing an additional lifetime ban against Irving under section 18501.

### DISPOSITION

In Perrodin's appeal, we reverse the judgment for Bradley and enter judgment for Perrodin. The certificate of election for Bradley is annulled; a new certificate of election shall be issued to Perrodin. Perrodin is awarded costs, but not attorney fees, on appeal.

In Irving's appeal, we affirm the portion of the judgment annulling Irving's election under section 16100, subdivision (c), for having committed offenses against the elective franchise. Under section 16100, subdivision (c), Irving is disqualified from seeking or filling the council seat she had sought in the 2001 election, for the remainder of that 2001 term. The certificate of election for Irving is annulled. We reverse the portion of the judgment imposing a lifetime disqualification from public office against Irving under section 18501. Irving shall bear her own costs.

We reverse the portion of the judgment declaring Andrews the winner of the June 5, 2001, city council runoff election. The June 5, 2001, runoff election between Andrews and Irving is annulled and set aside in its entirety.

The certificate of election for Andrews is annulled, and Andrews's city council seat shall be vacant upon the finality of this opinion. Andrews shall bear her own costs.

Spencer, P. J., and Mallano, J., concurred.

A petition for a rehearing was denied March 27, 2003, and March 28, 2003, and the petitions of both respondents for review by the Supreme Court were denied June 11, 2003.